Brett C. **KIMBERLIN,**
et al., Plaintiffs,

v.

**UNITED STATES DEPARTMENT OF JUSTICE, et al., Defendants.**

**No. CIV. A. 97–2663(EGS).**

United States District Court,
District of Columbia.

May 22, 2001.

Arthur Barry Spitzer, American Civil Liberties Unio, Washington, DC, for Plaintiff.

Brett C. Kimberlin, Pro Se.

Michael Anthony Humphrey, U.S. Atty's Office, Washington, DC, Robin Earnest, U.S. Dept. of Justice, Washington, DC, Jennifer U. Toth, U.S. Atty's Office, Washington, DC, Halsey B. Frank, U.S. Atty's Office, Portland, ME, for Defendant.

## MEMORANDUM OPINION AND ORDER

SULLIVAN, District Judge.

## I. INTRODUCTION

Brett Kimberlin and Darrell Rice, prison inmates, challenge the constitutionality of the Bureau of Prisons' ("BOP") ban on electric or electronic instruments in federal prisons, except those used in connection with religious activities, and the Zimmer Amendment, section 611 of Pub.L. No. 104–208, 110 Stat. 3009 ("the Amendment"), which bans federal funding for electric or electronic instruments in federal prisons but does not by its terms create a religious use exception. Claims 1 and 2 of plaintiffs' complaint allege that BOP violated the Administrative Procedures Act, 5 U.S.C. § 706 (1996)("APA"). Claim 3 alleges that BOP interferes with their First Amendment right to expression through music and music writing. Finally, Claim 4 alleges that BOP's policy deprives plaintiffs of their First and Fifth Amendment rights. Plaintiffs seek declaratory and injunctive relief against BOP.

Pending before the Court are BOP's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), and plaintiffs' motion for summary judgment pursuant to Fed.R.Civ.P. 56. Subsequent to the filing of these pleadings, plaintiff filed an Amended Complaint adding an additional plaintiff and updating and refining the original complaint which was filed *pro se*. All the Claims asserted in the Amended Complaint have been adequately addressed by the original pleadings, supplemental pleadings, and oral arguments in this case; thus, no additional pleadings are required. Upon careful consideration of those motions, the oppositions thereto, relevant case law, and the arguments in Court, BOP's motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**. Plaintiffs' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. This case is **DISMISSED**.

## II. BACKGROUND

The Zimmer Amendment was initially enacted as section 611 of the Omnibus Budget Act of Fiscal Year 1997, which expired at the end of the 1997 fiscal year. The Amendment has been re-enacted in each subsequent federal budget. The Amendment states that:

None of the funds made available in this Act shall be used to provide the following amenities or personal comforts in the Federal prison system:

(i) in cell television viewing except for prisoners who are segregated from the general prison population for their own safety;

(ii) The viewing of R, X, and NC 17 rated movies, through whatever medium presented;

(iii) any instruction (live or through broadcasts) or training equipment for boxing, wrestling, judo, karate, or other martial art, or any bodybuilding or weightlifting equipment of any sort;

(iv) possession of in-cell coffee pots, hot plates, or heating elements;

(v) the use or possession of any electric or electronic musical instrument.

The Amendment's legislative history consists of this comment by Representative Dick Zimmer introducing the Amendment on the floor of the House of Representatives:

[T]his amendment deals with prison amenities. *Prison perks are bad public policy and a waste of taxpayer dollars.* My amendment is designed to start eliminating them from Federal Prisons.

In some prisons, inmate amenities are better than what law-abiding Americans have. *Prisons should be places of detention and punishment; prison perks undermine the concept of jails as a deterrence. They also waste taxpayer money.* . . .

[M]y amendment would help end this taxpayer abuse by prohibiting funds from being spent in Federal prisons on luxuries such as martial arts instruction, weight rooms, in-cell televisions, sexually explicit or violent movies, and *expensive electronic musical instruments. We must make sure we are spending public funds wisely, not using them on amenities that have little or no bearing on institutional security and that far exceed basic standards of human dignity* . . . .

[M]y amendment has won the support of the Law Enforcement Alliance of America, the Nation's largest coalition of law enforcement officers, crime victims, and concerned citizens. This is a reasonable amendment. It does not provide for a return of the chain gang. It does provide for a return to common sense . . . .

I urge my colleagues to support this amendment. Prison perks are bad public policy and a waste of taxpayer dollars. My amendment is designed to start eliminating them from Federal Prisons.

.        .        .        .        .

Earlier this year during consideration of the anti-crime component of the Contract with America, this House accepted a no-frills prison amendment I offered that requires the Attorney General to set specific standards governing conditions in the Federal prison system that provide the least amount of amenities and personal comforts consistent with constitutional requirements and good order and discipline in the Federal prison system.

That amendment also requires the Bureau of Prisons to submit an annual audit to Congress listing exactly how much is spent at each Federal prison for basics and how much is spent on extras, perks, and amenities.

This requirement will allow Congress to get a handle on whether we are spending taxpayers money on reasonable items to maintain and secure prisoners, or whether money is being wasted on luxuries that many law-abiding Americans cannot afford.

We must make sure we are spending public funds wisely-not using them on amenities that have little bearing on institutional security.

141 Cong. Rec. H7751-01.

BOP implements legislation through formal or informal rulemaking, Program Statements, Operations Memoranda, and/or other memoranda. According to BOP's Rules Administrator,

> "[b]ecause the provisions of the Zimmer Amendment do not allow the BOP any discretion in the provisioning of specific amenities, there is not need to initiate rulemaking under the [APA]. BOP accordingly could proceed to advise ... wardens how to implement the legislation via internal memoranda."

BOP implemented the Amendment through Program Statements and Memorandum. Thus, there are no BOP regulations pertaining to the Amendment.[1]

BOP issued a Program Statement—Guidelines for Implementation of the Amendment—on November 15, 1995. It states that "[p]rovisions of the Zimmer Amendment relate only to the use of appropriated funds. Given our understanding of the intent, however, the guidance provided herein may very slightly from a literal reading of the amendment." Specifically, referring to electrical instruments, it states:

1. Institutions which currently have electric guitars or electronic instruments may retain these instruments. No appropriated funds will be used to purchase new or to repair existing equipment.

2. New institutions will not purchase electric or electronic instruments.

3. Trust Fund profits or inmate organization funds will not be used to purchase or repair electric or electronic equipment. Donations of these types of instruments will not be accepted.

4. The only authorized exception is electric or electronic equipment which is used in conjunction with religious activities, stored in the chapel area and is [sic] under the supervision of the Religious Services Department. Appropriated funds may be used to purchase or maintain such equipment in all BOP facilities.

BOP implemented this policy immediately, and, as a result, it predates the enactment of the Amendment.

On August 26, 1996, BOP issued a memorandum addressing questions BOP received regarding how to implement the Amendment. The memorandum clarified the following:

1. Inmates may not use their own money to buy electric or electronic instruments as personal property.

2. Electric and electronic instruments are keyboards, electric guitars, and any other electric instrument that produces music.

3. Microphones, amplifiers, speakers, tape players, and record players are excluded from the prohibition.

4. The recreation staff may not purchase guitar strings for electric guitars nor may they use strings that were already on hand prior to Fiscal Year 1996.

5. Prisoners are to mail home all musical instruments by November 1, 1997.

---

1. Federal regulations do provide for inmate recreation programs, including music programs. *See* 28 C.F.R. § 544, *et seq.* The goal of the recreation programs is to ensure, to the extent possible, that leisure activities are provided to meet social, physical, psychological, and overall wellness needs of inmates. 28 C.F.R. § 544.32. BOP last amended regulations regarding recreation programs in 1993.

BOP phased electrical instruments out of the music program, rather than eliminating all the electrical instruments at once. BOP anticipated that this gradual change would minimize inmate reaction to the Amendment. The phase-out plan is not contrary to the Amendment because it does not involve appropriated funds to implement. In addition, the policy became effective prior to the enactment of the Amendment.

BOP interprets the Zimmer Amendment as not allowing inmates to use personal monies or trust funds [2] to purchase or repair electrical instruments. BOP is of the opinion that the use of other funding sources to purchase or repair electrical instruments would only circumvent the intent of Congress.

BOP also interprets the Amendment as not applicable to electrical instruments used in conjunction with religious activities. As BOP states:

[c]ongregational singing with musical instrument accompaniment is a traditional component of the worship experience. This exception was made because the BOP does not find that it was the intent of Congress to restrict the use of musical instruments as part of the religious services ceremonies.

The legislation did not refer to elimination of electric musical instruments used in performance of religious services, only those electric instruments that were amenities or personal comforts of inmates. Hence the exception of keeping electric and electronic musical instruments in the Chaplaincy [sic] for use in religious services.

The Zimmer Amendment does not restrict BOP's ability to buy non-electrical instruments. Plaintiffs assert that an acoustic guitar is not equivalent to an electric guitar. According to plaintiff Kimberlin, it is impossible for him to play his songs on an acoustic guitar. He is not able to make long, sustained notes. Also, he cannot perform a technique called "vibrato" because the strings on an acoustic guitar will not bend or sustain like those on an electric guitar.

## III. STANDARD OF REVIEW

Before the Court are defendant's motion to dismiss and plaintiffs' motion for summary judgment. The Court will first address defendant's motion to dismiss. A party moving for dismissal under Federal Rule of Civil Procedure 12(b)(6) has the burden of proving that the nonmovant has failed to state a claim upon which relief can be granted. To prevail, the movant must show "beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim [that] would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). For purposes of determining whether a complaint states a cause of action upon which relief can be granted, the averments in the complaint are taken as true, and plaintiffs are given the benefit of any doubts and of all reasonable inferences that can be drawn from the facts alleged. See *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994).

## IV. DISCUSSION

Plaintiffs challenge the Zimmer Amendment on its face and as applied through BOP's policy. However, BOP's policy pre-

---

**2.** Inmates are provided a type of account into which they may deposit any monies that they earn or receive. They may use these monies to purchase any goods and services not other-wise available to them, through BOP's Prison Trust Funds Program and Commissary. The use of these funds is a privilege that BOP may limit or deny.

dates the Amendment. Accordingly, the Court must determine the proper object of judicial scrutiny. The D.C. Circuit recently held that if a plaintiff

> attack[s] the proscriptions of the statute not embodied in the regulations, they effectively pursue a pre-enforcement challenge. Even in the First Amendment context, such a challenge presents a justiciable controversy only if the probability of enforcement is real and substantial. In the statutory borderland beyond the implementing regulations, . . . the prospect of enforcement appears inconsequential.

*Amatel v. Reno,* 156 F.3d 192, 194 (D.C.Cir.1998). The Circuit refused to analyze whether a statute that bans funding for the distribution of sexually explicit materials is constitutional. Rather, the court focused on the constitutionality of the substantive prohibitions of the regulations. The Circuit noted that the district court incorrectly assumed that the statute itself had been and will be applied and it directed its analysis primarily towards the statute. There, BOP implemented its regulations after the enactment of the Amendment.

Here, as in *Amatel,* any challenge to parts of the Amendment not embodied in BOP's policy is a pre-enforcement challenge. BOP enacted its policy before the enactment of the Amendment. The Amendment had the effect of limiting what BOP could do, but BOP could have implemented the policy without Congressional action. Therefore, this Court has focused on the constitutionality of BOP's policy. In any event, to the extent BOP's policy passes constitutional muster, so does the Amendment.

## A. First Amendment

### 1. *Definition of the Right*

■ Plaintiffs argue that BOP's policy infringes on their First Amendment rights.

Plaintiffs assert that without access to electric guitars, they are unable to express themselves by playing, performing, and composing music. The Supreme Court and this Circuit recognize musical expression as a form of constitutionally protected speech. *See Ward v. Rock Against Racism,* 491 U.S. 781, 790, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (city's regulation of rock concert in city park must meet the demands of the First Amendment); *United States v. Williams,* 986 F.2d 86, 87 (4th Cir.1992) (beating a drum in the context of an anti-war demonstration is expressive conduct protected by the First Amendment); *see also Hayes v. Schmidt,* 69 F.R.D. 56, 58 (W.D.Wis.1975) (granting a motion to dismiss, the court noted that the prisoner's interest in playing his musical instrument is important enough to require officials to demonstrate sufficient justification for restrictions placed on exercise of that interest, but the court declined to decide whether this interest is fundamental). Thus, plaintiffs are correct to assert that they have a First Amendment right to express themselves through music.

■ Notwithstanding, BOP has not prohibited all musical expression, only the use of electrical instruments. An active music program and other informal means of musical expression still exist. Plaintiffs contend that an electric guitar is essential to their musical expression. Thus, they argue, banning this instrument is an absolute ban on their musical expression. Plaintiffs are incorrect in asserting that music created by an electric instrument is a distinct expression protected by the First Amendment. This Court has not found, and plaintiffs do not cite, any cases addressing this proposition. Accordingly, the issue is whether BOP's policy impermissibly limits a prisoner's First Amendment right to ex-

press himself through music by banning one of several mediums by which a prisoner can musically express himself.

### 2. *Turner Factors*

■ Prison walls do not "separate inhabitants from their constitutional rights." *Amatel,* 156 F.3d at 194 (citing *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). However, the nature of prisons does allow "regulation more intrusive than what may lawfully apply to the general public." *Id.* at 195 (citing *Turner,* 482 U.S. at 84–85, 107 S.Ct. 2254; *Connick,* 461 U.S. at 143, 103 S.Ct. 1684). BOP can limit plaintiffs' First Amendment rights to express themselves musically because plaintiffs are prisoners. For prisoners to show that such a limitation amounts to a First Amendment violation, they must prove that the challenged action is not reasonably related to a legitimate penological interest. *See Thornburgh v. Abbott,* 490 U.S. 401, 409, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *Turner,* 482 U.S. at 89, 107 S.Ct. 2254. The Supreme Court has confirmed that the test set forth in *Turner* must be applied to determine whether there is a violation of a prisoner's First Amendment rights. *See Shaw v. Murphy,* 532 U.S. 223, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001); *Thornburgh,* 490 U.S. at 414, 109 S.Ct. 1874; *see also Amatel v. Reno,* 156 F.3d 192, 194 (D.C.Cir.1998).

■ The first *Turner* factor is multifold: a court must determine whether the governmental objective underlying the regulations at issue is legitimate and neutral, and that the regulations are rationally related to that objective. *See Turner,* 482 U.S. at 89–90, 107 S.Ct. 2254. The second factor is whether there are alternative means of exercising the right that remain open to

prisoners. *Id.* at 90, 107 S.Ct. 2254. The third factor under *Turner* is the impact on the prison of accommodating the asserted right. *Id.* at 90–91, 107 S.Ct. 2254. Finally, *Turner* held that the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns. *Id.* at 90–91, 107 S.Ct. 2254.

The Supreme Court requires courts to analyze the restriction of a prisoner's First Amendment rights using the *Turner* standard, regardless of the severity of the restriction. For example, in *Amatel,* 156 F.3d at 194, the Circuit upheld the restriction on the distribution of sexually explicit materials using the *Turner* factors.

### a. *The Governmental Objective Is Legitimate.*

■ BOP maintains that the objective of its policy is to enhance the punishment aspect of prisons, as a deterrent. When determining intent, courts should start with the assumption that the purpose is expressed by the ordinary meaning of the words used. *See INS v. Elias–Zacarias,* 502 U.S. 478, 482, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). The plain meaning of BOP's policy (and the Amendment) suggests that the purpose was to decrease spending on certain prison amenities and personal comforts. Thus, the Court could interpret the policy (and the Amendment) as an appropriation measure. If the plain meaning of the policy (and the Amendment) does not enlighten a court of the intent, courts may look to the policy's (and the Amendment's) history. BOP implemented the policy in anticipation of and to enforce the Zimmer Amendment, which was pending enactment. The legislative history of the Amendment supports the conclusion that Congress enacted the Zimmer Amendment to curb spending on prison amenities and to enhance the punish-

44

ment aspect of prison as a deterrent. Thus, the punitive intent is clear from the legislative history.

■ Contrary to plaintiffs' argument, the Supreme Court has long recognized that Congress has a legitimate penological interest in punishment and deterrence. *See Rhodes v. Chapman,* 452 U.S. 337, 352, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) (defining penal function as: "to punish justly, to deter future crime, and to return imprisoned persons to society with an improved change [sic] of being useful, law-abiding citizens"); *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987); *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) (stating that "[a]n important function of the corrections system is the deterrence of crime," while analyzing prisoners' First Amendment right to have face-to-face interviews with journalists). However, the government has never defended a restriction solely on deterrence or punishment grounds. This appears to be the first instance where the government asserts only deterrence and/or punishment as a legitimate reason for limiting a prisoner's First Amendment rights. The government usually asserts internal order, security, and/or rehabilitation as the legitimate objective. *See e.g. Thornburgh,* 490 U.S. at 415, 109 S.Ct. 1874; *O'Lone,* 482 U.S. at 350, 107 S.Ct. 2400; *Turner,* 482 U.S. at 91, 107 S.Ct. 2254. The fact that the government has never asserted these interests should not abrogate the Supreme Court's opinion that punishment and deterrence are legitimate goals that will support the limitation of First Amendment and other constitutional rights. The Supreme Court has given guidance and it would be imprudent to ignore such guidance for lack of on point precedent.

What's more, the Supreme Court held that "to the extent that [prison] conditions are restrictive or even harsh, they are part of the penalty that criminal offenders pay for their offenses to society." *Rhodes,* 452 U.S. at 347, 101 S.Ct. 2392 (1981) (holding that it was not cruel and unusual punishment for prisoners to be confined to double cells); *see also Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948) (noting that "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system"). This Circuit has concluded that a court, and presumably Congress, "could, consistent with the Constitution, deprive male and female inmates of virtually all of the programs they now enjoy." *Women Prisoners of the District of Columbia Dept. of Corrections v. District of Columbia,* 93 F.3d 910, 927 (D.C.Cir.1996).

Plaintiffs also incorrectly assert that the government has no deterrence interest in current prisoners that justifies harsher prisons. This is simply not true. In fact, a prisoner at the time the policy is implemented is very likely to feel the effects of the policy. This current inmate will experience first hand the punishment, which will hopefully deter him and others in the future. Furthermore, it would not be practical to allow the current inmates to use and possess everything banned in the Amendment and only restrict prisoners who entered the prison system after the policy.

b. *The Governmental Objective Is Neutral.*

BOP's objective is neutral. This factor requires a court to look to the policy's goals, not the policy itself, to determine neutrality. *See Amatel,* 156 F.3d at 197. Neutral means no more than "the regulation or practice in question must further an important or substantial governmental

interest unrelated to the suppression of expression." *Thornburgh,* 490 U.S. at 415, 109 S.Ct. 1874. In *Thornburgh,* the Supreme Court found neutrality because the prison administrators were to draw distinctions based solely on the potential implications for prison security. *Id.* at 416, 109 S.Ct. 1874. In *Amatel,* 156 F.3d at 197, the Circuit found that prohibiting the distribution of sexually explicit materials served to rehabilitate, a neutral objective.

Here, the policy seeks to deter crime by making prison harsher. This goal is unrelated to the suppression of musical expression. BOP did not seek to suppress musical expression *per se.* Rather, it sought to make prisons harsher by prohibiting luxury items, including electrical and electronic instruments.

### c. BOP's Policy Is Rationally Related to Its Objective.

██ ██ The policy is rationally related to its objectives. The Circuit has recognized that prison jurisprudence has not developed enough to indicate the precise demands of the rational means-ends connection. *See id.* at 199. A court must determine if the legislature's judgment is rational, not whether the court agrees with the legislature. *See, e.g., Nordlinger v. Hahn,* 505 U.S. 1, 11, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992). Another question is whether the legislature might reasonably believe that the policy will advance the governmental interest, not whether the policy in fact advances that interest. *See Amatel,* 156 F.3d at 199. As a result, it is unnecessary to look at evidence of the actual deterrence effect of prohibiting certain amenities.

Congress took away several amenities that, in the aggregate, it perceived would make prisons more of a deterrent. While banning musical instruments, by itself, may not actually deter anyone, it is possi-

ble that BOP (and Congress) thought the ban would indicate to society that prison is a harsh place where one does not want to be. The legislative history indicates that the Amendment was introduced, and presumably passed, because it would strengthen the deterrent effect of prison by harshening the conditions.

The government could rationally see a connection between the deterrence goal of prison and the conditions of prison. Congress could have seen luxuries in prisons as contrary to a perception of prison that is necessary for deterrence. That is, prisons should be seen as a terrible place to effectively deter crime. The supposition that exclusion of electric instruments will have much of an impact on this perception may be optimistic, but it is not irrational. Especially when considering that Congress not only banned electrical instruments, but also weights, fight training, R, X, and NC–17 rated movies, commercially published information or material known to be sexually explicit or featuring nudity (Ensign Amendment, section 614, Pub.L. No. 104–208, 110 Stat. 3009), and in-cell coffee pots, hot plates, heating elements, and televisions.

██ Plaintiffs infer that Congress acted improperly by enacting the Amendment without fact finding or consulting with prison officials and administrators. They also suggest that Congress improperly enacted the Amendment without putting forth evidence that the Amendment was in response to any real or perceived threat to institutional security, discipline, or good order in federal prisons. Congress does not have a duty to create a factual record with respect its Amendment. As BOP correctly indicated, Congress has the power to legislate prison conditions, so long as its legislation does not run afoul of the Constitution. It does not have to get input from BOP on any of its legislation,

nor does it have to conduct fact finding to pass valid legislation. *See Heller v. Doe*, 509 U.S. 312, 316, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (noting that the legislature is not required to convince the courts of the correctness of its legislative judgments); *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (noting that the legislature is not required to articulate its reasons for enacting a statute). In *Amatel*, 156 F.3d at 199, the Circuit indicated that *Turner* does not require record evidence, such as social science data for a valid regulation to be valid. The Circuit held that a court may rely on common sense to determine whether there is a rational link between a policy and the asserted governmental interest. *See id.*

Plaintiffs argue that BOP's history of successfully administering a music program that allowed access to electrical instruments evidences the irrationality of the program. The fact that BOP successfully ran the program in the past is irrelevant to whether eliminating the use of electric instruments would have a deterrent effect. As BOP noted, since the policy deprives plaintiffs of electrical instruments as a comfort and amenity, the prison is somewhat harsher.

d. *There Are Alternate Means of Exercising the Right that Remain Open to Prisoners.*

The Amendment, by its terms, does not prohibit prisoners from purchasing or repairing electrical instruments at their own expense. However, BOP's policy does make this restriction. In making such a restriction BOP does not violate the APA, as asserted in Claims 1 and 2. Instead, BOP has created a new restriction under its power to manage the prisons. Accordingly, this Court has analyzed BOP's policy as a ban on the use or possession of musi-

cal instruments, even though the Zimmer Amendment was only a spending restriction. As the D.C. Circuit noted in *Amatel*, 156 F.3d at 194 n. 1, "[w]hen the government absolutely monopolizes the means of speech or controls a bottleneck, as we are to assume vis-a-vis the prison distribution system, a refusal to fund functions the same as an outright ban."

When analyzing this factor, the Circuit cautions that "[i]f the right at stake is defined in terms of the materials excluded by the ban, any regulation will come up short." *Amatel*, 156 F.3d at 201. In *Thornburgh*, 490 U.S. at 417, 109 S.Ct. 1874, the Supreme Court noted that the relevant right "must be viewed sensibly and expansively." In *Thornburgh*, 490 U.S. at 418, 109 S.Ct. 1874, the Court upheld a ban on all sexually explicit material in part because the ban allowed for an alternate means of exercising the right at issue—the ban allowed a broad range of other publications to be sent. In *Turner*, 482 U.S. at 92, 107 S.Ct. 2254, the Supreme Court noted that a correspondence regulation "[did] not deprive prisoners of all means of expression. Rather, it bars communication only with a limited class of other people with whom prison officials have particular cause to be concerned." The Circuit held in *Amatel*, 156 F.3d at 200, that unless there is some minimum entitlement to smut in prison, a ban on sexually explicit material does provide for alternate means of expressing the right at issue. Furthermore, as the Circuit noted, "even if there was such a bizarre entitlement, the [policy] would still satisfy this factor, as [it] leave[s] the inmate free to enjoy all written forms of smut not otherwise barred." *Id.* n. 7.

Plaintiffs argue that to require them to express themselves musically on an acoustic instrument would be akin to requiring rap musicians to sing ballads, or Muslim prisoners to attend Catholic religious ser-

vices.[3] Plaintiffs insist that they cannot perform their music on acoustic instruments.

Plaintiffs are free to express themselves musically using other instruments, such as an acoustic guitar. Like the prisoners in *Amatel,* plaintiffs are only limited, not deprived. They can perform music written for an electric guitar on an acoustic guitar. This is not the same as expression on an electric instrument, but it is certainly an alternate to such expression. Moreover, plaintiff Kimberlin has stated that he has written a song which he can hear in his mind, but cannot perform, edit, polish, or get feedback. He may discuss the notes, lyrics, and ideas with others as a means of expressing himself through his music and getting feedback. Again, this is not the same as playing the electric guitar, but it is an alternate that allows him to express himself musically. If the Court defined the right as plaintiffs insists—one allowing him to express himself through electric instruments—the ban would fail because, like the Circuit cautioned in *Amatel,* any regulation would come up short.

e. *The Impact of Any Accommodation of the Asserted Constitutional Right on Prison Personnel, Other Inmates, or the Allocation of Prison Resources Generally is Significant.*

Plaintiffs assert that restoring access to electric instruments would do nothing to disturb BOP's administration of the prison system; thus, there is minimal impact on the prison. In addition, plaintiffs assert that inmates could be permitted to purchase and repair electrical instruments with personal funds, raised funds, or money from the Inmate Commissary Fund[4]. This is an easy alternative that would alleviate any appropriation concerns.

BOP merely argues that it cannot accommodate plaintiffs without contravening the Amendment's legitimate purpose of making prisons more of a deterrent. This Circuit recognizes this argument as valid. *See Amatel,* 156 F.3d at 201 (holding that "if Congress may reasonably conclude that pornography increases the risk of prison rape, then the adverse impact is substantial. Accommodating the right poses a threat to the safety of guards and other inmates").

f. *There Are No Obvious, Easy Alternatives that Suggest that the Policy Is Not Reasonable.*

At first blush, this factor presents a problem for BOP. Because BOP allows the use of electrical instruments for religious purposes, it has undercut its argument that the policy is reasonable. However, in the next section, the Court concludes that BOP's policy regarding electrical instru-

---

**3.** Here, plaintiffs seek to compare their case with *O'Lone,* 482 U.S. at 351, 107 S.Ct. 2400 (holding that it was a sufficient alternate means for prisoners to participate in Muslim religious ceremonies other than the Jumu ah religious ceremony) and *Luke Records, Inc. v. Navarro,* 960 F.2d 134, 137 (11th Cir.1992) (per curiam).

With respect to *Luke Records,* plaintiffs argue that the court in that case held that rap record, "As Nasty As They Wanna Be" constitutes speech protected by the First Amendment because it contains oral conventions specific to African–American culture and ex-press both politically and culturally significant ideas. However, the challenge in that case was to the characterization of the lyrics as obscene under the Florida statute and the application of the *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) obscenity test.

**4.** The Inmate Commissary Fund may be disbursed for any purpose accruing to the benefit of the inmate body as a whole such as amusement, education, library, or general welfare work. *Washington v. Reno,* 35 F.3d 1093, 1101 (6th Cir.1994).

ments for religious purposes is impermissible. Without this exception, plaintiffs cannot point to any other alternative that suggests the policy is unreasonable. Nevertheless, the existence of the exception does indicate that BOP may not believe that the prohibition reasonably acts as a deterrent. However, BOP's beliefs may be inconsistent with the legislature's beliefs. Once Congress enacted the Amendment, BOP could not create the exception. BOP does not have the authority to second-guess Congress. *See Public Citizen v. FTC,* 869 F.2d 1541, 1557 (D.C.Cir.1989). Accordingly, this Court will not find that the exception, which this Court holds is impermissible, prevents a finding that the policy is unreasonable.

### 3. Conclusion

■ For the foregoing reasons, the Court grants defendant's motion to dismiss as to Claims 1, 2 and 3. Judgment is entered in favor of defendants on these Claims.

### B. Religion Exception

Plaintiffs challenge BOP's implementation of a religious-use exception to the Amendment on two grounds. First, plaintiffs argue that the actions violate the First and Fifth Amendments because prison inmates are permitted to use electric instruments to perform music in connection with religious activities. Second, they argue that the actions are arbitrary and capricious because they discriminate in favor of religion.

It is a well-settled principle of law that a court "will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed." *Slack v. McDaniel,* 529 U.S. 473, 120 S.Ct. 1595, 1604, 146 L.Ed.2d 542 (2000) (quoting *Ashwander v. TVA,* 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J. concurring)). Accordingly, the Court addressed the APA violation first and found that the policy exceeds the limitation on BOP in the Amendment, a violation of the APA.

Plaintiffs assert that BOP's discrimination is an arbitrary and capricious action by a federal agency, citing 5 U.S.C. § 706. However, the Court must first decide whether BOP's interpretation is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Neither party has addressed this issue, but in analyzing whether the Amendment is arbitrary and capricious both parties do use the proper analytical framework.

BOP states that it was implementing the plain meaning of the Amendment (although the policy came before the Amendment), as follows:

[W]hether or not the Zimmer Amendment directly addressed the precise issue of prisoners use of electric instruments in connection with religious activities, it does permit the BOP to make a reasonable exception for such use. The Amendment prohibited federally funded comforts and amenities such as electric guitars in the interests of making prisons places of greater deterrence and punishment. It did not call for the elimination of electric instruments used in connection with religious activities.

■ The Supreme Court has created a two-part test for determining whether to uphold an agency's interpretation of a statute. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Court must first look at whether the agency's interpretation flows from the unambiguous meaning of the statute. *See id.* If the agency's decision does not flow from

the unambiguous meaning of the statute, the Court must determine whether the interpretation is a reasonable construction of ambiguous statutory language. *See id.* BOP's interpretation fails this test.

The interpretation does not flow from the unambiguous meaning of the Amendment. BOP is really arguing that its interpretation is valid based on the purpose of the Amendment not the plain meaning. BOP stated in its November 15, 1995 memorandum, page 1, that "the guidance . . . may differ slightly from the literal reading of the amendment." Thus, it acknowledges that its guidance does not flow from literal or unambiguous words of the Amendment.

▆ Also, BOP's interpretation is not a reasonable construction of ambiguous statutory language. The Amendment is clear "[n]one of the funds . . . shall be used to provide the following amenities or personal comforts . . . the use or possession of any electric or electronic musical instrument." First, BOP argues that the Amendment only bans the use or possession of electrical instruments when such use or possession is for personal comfort. If Congress meant to create an exception it could have done so explicitly by qualifying use or possession as personal use or possession, which it did when banning in-cell coffee pots, hot plate, heating elements, and televisions. Second, BOP argues that prisoners do not personally possess the instruments that are used in conjunction with religious activities; those instruments are stored in chapels under the supervision of the Religious Services Department. This argument cuts in favor of plaintiffs, since plaintiffs want BOP to purchase and maintain electric instruments as a part of the recreation program, and store them under the supervision of the Recreation Department. Third, BOP argues that instruments maintained for religious purposes are used in conjunction with religious activities not personal use. Again, this argument cuts in favor of plaintiffs' request that BOP maintain electric instruments for recreational use, not merely "personal use."

In any event, the Supreme Court has recently stated that agency opinion letters are not entitled to the *Chevron* deference. *See Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000); *District of Columbia Hospital Assoc. v. District of Columbia,* 224 F.3d 776, 780 (D.C.Cir.2000). The Supreme Court distinguish the deference given to an interpretation contained in an opinion letter from one arrived at after a formal adjudication or notice-and-comment rule-making, such as a regulation. Instead, interpretations contained in formats such as opinion letters, internal agency guidelines, interpretive rules, and enforcement guidelines, are entitled to respect, but only to the extent they have the power to persuade. *See Christensen,* 529 U.S. at 587, 120 S.Ct. 1655.

It is true that the Amendment does not detail which items are amenities and which are personal comforts, but this is irrelevant. The Amendment is unambiguous because it clearly prohibits the use of funds for electrical instruments. There is no reasonable reading of the Amendment that would create a religious use exception. Furthermore, the reasons, stated in BOP policy and affidavits filed in connection with the motions, for the religious use exception do not have the power to persuade.

The D.C. Circuit held that "[w]hile agencies may safely be assumed to have discretion to create exceptions at the margins of a regulatory field, they are not empowered to weigh the costs and benefits of regulation at every turn; agencies surely do not have inherent authority to second-guess Congress' calculations." *Public Citizen v.*

*FTC,* 869 F.2d at 1557. The religion exception is hardly at the margin of the field that was limited by the Amendment. Accordingly, the religious use exception is in violation of the APA. Because this Court decided the challenge to the religion use exception on non-constitutional grounds, it need not address the constitutional issues raised by the religious exception.

For the foregoing reasons, defendant's motion to dismiss Claim 4 is denied.

## V. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

With respect to plaintiffs' motion for summary judgment, BOP raises no genuine issues of material fact which would preclude summary judgment on the remaining issues in this case. Viewing the facts in the light most favorable to BOP, as required by Fed.R.Civ.P. 56, *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), this Court grants plaintiffs' motion as to Claim 4. BOP permitted the use of electric or electronic instruments in connection with religious activities in violation of the APA, as stated above. Defendant BOP is hereby enjoined from providing electrical or electronic musical instruments in connection with religious activities.

**IT IS SO ORDERED.**