Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 18, 2002      Decided February 11, 2003

No. 01-5387

BRETT C. KIMBERLIN AND DARRELL RICE,
APPELLANTS

v.

U.S. DEPARTMENT OF JUSTICE AND BUREAU OF PRISONS,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 97cv02633)

———

*Arthur B. Spitzer* argued the cause for the appellants.

*Robin M. Earnest*, Assistant United States Attorney, argued the cause for the appellees. *Roscoe C. Howard, Jr.*, United States Attorney, and *R. Craig Lawrence*, Assistant United States Attorney, were on brief.

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before: SENTELLE, HENDERSON and TATEL, *Circuit Judges.*

Opinion for the court filed *Per Curiam.*

Concurring opinion filed by *Circuit Judge* HENDERSON.

Separate opinion concurring in part and dissenting in part filed by *Circuit Judge* TATEL.

PER CURIAM: The appellants, Brett C. Kimberlin and Darrell Rice are, respectively, a former inmate and a current inmate of the Federal Correctional Institution in Cumberland, Maryland (Cumberland).[1] Kimberlin and Rice appeal an order of the district court dismissing in part their challenge to Bureau of Prisons (BOP) regulations that prohibit federal inmates from possessing electric or electronic musical instruments (other than for religious purposes). *See Kimberlin v. Dep't of Justice*, 150 F. Supp. 2d 36 (D.D.C. 2001). The appellants contend the regulations both exceed the BOP's statutory authority, in violation of the Administrative Procedure Act (APA), and infringe their rights under the First Amendment to the United States Constitution to freedom of (musical) expression. We conclude the district court correctly rejected each contention.

On July 26, 1995 a then congressman from New Jersey introduced a budget rider (Zimmer Amendment) to prohibit the use of appropriated funds to provide for several enumerated "amenities or personal comforts in the federal prison system," including "the use or possession of any electric or electronic musical instrument." 147 Cong. Rec. H7751, H7768 (July 1995) (statement of Rep. Zimmer)

On November 15, 1995 the BOP issued a memorandum "providing guidance to wardens on how provisions of the Zimmer Amendment will be implemented in all [BOP] institutions." JA 50. The memorandum expressly noted that, while "[p]rovisions of the Zimmer Amendment relate only to the use of appropriated funds," given the BOP's "understanding of the intent," "the guidance provided [in the memorandum]

---

[1] Kimberlin was released from Cumberland in 2001. *See* Appellees' Br. at 10 n.4.

. . . may vary slightly from a literal reading of the amendment." *Id.* With regard to electric and electronic musical instruments, the memorandum provides:

> *Use or Possession of any Electric or Electronic Musical Instrument:*
>
> This section prohibits the use of funds for inmates' use or possession of electric or electronic musical instruments.
>
> 1. Institutions which currently have electric or electronic instruments may retain these instruments. No appropriated funds will be used to purchase new or to repair existing equipment.
>
> 2. New institutions will not purchase electric or electronic instruments.
>
> 3. Trust Fund profits or inmate organization funds will not be used to purchase or repair electric or electronic equipment. Donations of these types of instruments will not be accepted.
>
> 4. The only authorized exception is electric or electronic equipment which is used in conjunction with religious activities, stored in the chapel area and is under the supervision of the Religious Services Department. Appropriated funds may be used to purchase or maintain such equipment in all BOP facilities.

JA 54–55.

On December 28, 1995 the BOP issued an "Institution Supplement" for Cumberland (No. CUM 5370.08),[2] which directed that "[t]he only musical instrument an inmate may possess is a harmonica," with the proviso that "[i]nmates with authorized possession of a guitar or keyboard at the time this supplement is issued may retain possession of the instrument while at this institution." The document also recited that "the institution will provide a limited number of musical

---

[2] "Institution Supplement" is "a label that apparently is attached to regulations issued by a particular prison pursuant to nationwide Bureau of Prisons regulations." *American Fed. of Gov't Employees, Local 2441 v. Fed. Labor Relations Auth.*, 864 F.2d 178, 183 n.4 (D.C. Cir. 1988).

instruments for the music program." No. CUM 5370.08 at 3–4.

On April 26, 1996 the Congress enacted the Zimmer Amendment as section 611 of the Omnibus Budget Act of Fiscal Year 1997, Pub. L. No. 104–208, 110 Stat. 3009, § 611. The enacted language, identical to that initially proposed by Representative Zimmer, was as follows:

None of the funds made available in this Act shall be used to provide the following amenities or personal comforts in the Federal prison system—

(1) in-cell television viewing except for prisoners who are segregated from the general prison population for their own safety;

(2) the viewing of R, X, and NC–17 rated movies, through whatever medium presented;

(3) any instruction (live or through broadcasts) or training equipment for boxing, wrestling, judo, karate, or other martial art, or any bodybuilding or weightlifting equipment of any sort;

(4) possession of in-cell coffee pots, hot plates, or heating elements; or

(5) the use or possession of any electric or electronic musical instrument.

The Zimmer Amendment has since been regularly incorporated into appropriations acts in identical form. *See* Pub. L. No. 107–77, 115 Stat. 748 (fiscal year 2002); Pub. L. No. 106–113, 113 Stat. 1501, § 611 (fiscal year 2000); Pub. L. No. 105–277, 112 Stat. 2681, § 611 (fiscal year 1999); Pub. L. No. 104–134, 110 Stat. 1321, § 611 (fiscal year 1998).

On December 28, 1996 the BOP issued another "Institution Supplement" (No. CUM 5370.08A) setting out the same restrictions on musical instruments as No. CUM 5370.08 except that the grandfather proviso was revised to prohibit retention of previously authorized guitars or keyboards as of November 1, 1997. No. CUM 5370.808A at 3–4 .

Appellant Kimberlin filed an initial complaint in this action on November 7, 1997. The amended complaint, filed on behalf of both appellants on May 17, 2001, alleged that the BOP musical instrument regulations violate the APA and infringe the appellants' First Amendment rights to express themselves musically (specifically by playing electric guitars) and, insofar as they make an exception for use of electric/electronic musical instruments in conjunction with religious activity, their Fifth Amendment rights to equal protection.

In a memorandum opinion and order dated May 22, 2001 the district court granted the BOP's motion to dismiss the complaint's APA and First Amendment claims and granted summary judgment in favor of Kimberlin and Rice on the Equal Protection claim. Kimberlin and Rice appeal the dismissal.[3]

## II.

" 'On appeal, we review the dismissal of the plaintiffs'. . . . complaint de novo, *Moore v. Valder*, 65 F.3d 189, 196 (D.C. Cir. 1995), and "accept all of the factual allegations in [the] complaint as true," ' *United States v. Gaubert*, 499 U.S. 315, 327, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (quoting *Berkovitz v. United States*, 486 U.S. 531, 540, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988))." *Sloan v. HUD*, 236 F.3d 756, 759 (D.C. Cir. 2001) (alteration original). Applying this standard, we conclude the district court's dismissal should be affirmed.

The appellants first contend the challenged regulations exceed the BOP's statutory authority, and therefore violate the APA, because the Zimmer Amendment prohibits only expenditure of public funds on electric and electronic instruments, not their mere possession by inmates. In reviewing the BOP's interpretation of the Zimmer Amendment, we use the familiar *Chevron* analysis:

> If . . . " 'Congress has directly spoken to the precise question at issue,' " we "must give effect to Congress's

---

[3] The BOP's cross appeal of the summary judgment was voluntarily dismissed by an order filed July 2, 2002.

'unambiguously expressed intent.'" *Secretary of Labor v.* [*Fed. Mine Safety & Health Review Comm'n*], 111 F.3d 913, 917 (D.C. Cir. 1997) (quoting *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)). "If 'the statute is silent or ambiguous with respect to the specific issue,' we ask whether the agency's position rests on a 'permissible construction of the statute.'" *Id.* (quoting *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694).

*National Multi Housing Council v. EPA,* 292 F.3d 232, 234 (D.C. Cir. 2002) (quoting *Cyprus Emerald Resources Corp. v. Fed. Mine Safety & Health Review Comm'n,* 195 F.3d 42, 45 (D.C. Cir.1999)). We conclude the BOP's absolute ban on electric and electronic musical instruments reflects, at a minimum, a reasonable interpretation of the Zimmer Amendment under *Chevron*.

As the BOP points out, Appellees' Br. at 15–16, the express language of the Zimmer Amendment supports its interpretation because the ban on using appropriated funds for "the use or possession" of electric and electronic instruments may reasonably be construed to prohibit paying for costs incidental to such use or possession, notably, those incurred for storage, supervision and electricity. *Cf. Envtl. Def. Ctr. v. Babbitt,* 73 F.3d 867, 871–72 (9th Cir. 1995) (holding "use of any government resources—whether salaries, employees, paper, or buildings—to accomplish a final listing [of a species as endangered] would entail government expenditure" and therefore would run afoul of statutory moratorium on spending for such purpose). Further, the blanket ban on electric and electronic instruments is consistent with the rationale underlying the amendment, as announced by its sponsor, that "[p]risons should be places of detention and punishment" and that "prison perks undermine the concept of jails as deterrence." 147 Cong. Rec. at H7768; *see Nat'l Sec. Archive v. United States Dep't of Def.,* 880 F.2d 1381, 1384–85 (D.C. Cir. 1989) (absent other legislative history, "we must look to the statements of the sponsors of the bill as 'the only authoritative indications of congressional intent'") (quoting *North Ha-*

*ven Bd. of Educ. v. Bell,* 456 U.S. 512, 527 (1982)).  Nor is the ban on electric and electronic instruments arbitrary or capricious, as the appellants contend, merely because it deviates from past policy.  The BOP implemented the new policy as a consequence of the Zimmer Amendment's enactment based on the Congress's rational determination that electric and electronic instruments are "perks" that make prison life less rigorous and therefore undermine its deterrence.[4]

We also reject the appellants' First Amendment challenge, but do so on grounds different from the district court's.  *See Jenkins v. Wash. Convention Ctr.*, 236 F.3d 6, 8 n.3 (D.C. Cir. 2001) ("The court may affirm the district court on grounds different from those relied upon by the district court.") (citations omitted).  First, we conclude that the BOP's decision to prohibit all use and possession of electric and electronic instruments does not implicate the appellants' First Amendment rights and that we therefore need not invoke the four factor analysis the United States Supreme Court established in *Turner v. Safley,* 482 U.S. 78, 89 (1987).  As we noted above, the aim of the Zimmer Amendment, as shown by both its text and the legislative history, is to prevent expenditure of public funds to provide inmates with "perks," including "the use or possession of any electric or electronic musical instrument," and the BOP has articulated this rationale to support its ban on all electric and electronic musical instruments.  *See supra* p. 6.  As the appellants acknowledge, "Congress is not required to fund the exercise of First Amendment rights."  Appellants' Br. at 11.  The Supreme Court has squarely "reject[ed] the 'notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State.'"  *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 546 (1983) (quoting *Cammarano v. United States,* 358 U.S. 498, 515 (1959) (Douglas,

---

[4] We do not consider the appellants' argument, raised belatedly in their reply brief, that the regulations are arbitrary and capricious insofar as they distinguish between electric or electronic instruments and acoustic instruments.  *See Steel Joist Inst. v. OSHA,* 287 F.3d 1165, 1166 (D.C. Cir. 2002) (argument raised for first time in reply brief is waived).

J. concurring)). This is not a case where the government has undertaken "to discriminate invidiously in its subsidies in such a way as to ' "aim[ ] at the suppression of dangerous ideas." ' " *Id*. (quoting *Cammarano*, 358 U.S. at 513 (quoting *Speiser v. Randall*, 357 U.S. 513, 519 (1958))). Rather, the BOP has simply chosen not to subsidize inmates' use or possession of a class of instruments requiring the expenditure of funds for electricity and care.

Even applying *Safley*, we conclude that the regulations banning electric/electronic instruments do not impermissibly infringe the appellants' First Amendment rights.

> *Safley* directs courts to uphold a regulation, even one circumscribing constitutionally protected interests, so long as it "is reasonably related to legitimate penological interests." We are to assess the overall reasonableness of such restrictions with attention to four factors: first, whether the restriction bears a "valid, rational connection" to the "legitimate governmental interest put forward to justify it," such that the "asserted goal is [not] so remote as to render the policy arbitrary or irrational," second, whether inmates retain alternative means of exercising the circumscribed right, third, the costs that accommodating the right imposes on other inmates, guards, and prison resources generally, and fourth, whether there are alternatives to the regulation that "fully accommodate[ ] the prisoner's rights at de minimis cost to valid penological interests."

*Amatel v. Reno,* 156 F.3d 192, 196 (D.C. Cir. 1998) (citing *Safley*, 482 U.S. at 89) (alterations original). Balancing the four *Safley* factors, we conclude that the challenged BOP regulations should be upheld.

The first and most important factor favors the regulations because the ban on electric musical instruments plainly bears a reasonable relationship to the legitimate interest of conserving correctional department funds. Further, the ban is reasonably related to the asserted goal—conserving correctional funds. Common sense tells us, and the appellants do not dispute, that a prisoner's possession and use of an electric

guitar costs correctional institutions money for electricity, upkeep, storage and supervision. *See Amatel*, 156 F.3d at 198 (noting that "scientific studies can have a corrective effect by establishing an apparently implausible connection or refuting an apparently obvious one, but, subject to such corrections, conformity to commonsensical intuitive judgments is a standard element of both reasonableness and rationality"). Thus, "[t]he logical connection between the regulation and the asserted goal is [not] so remote as to render the policy arbitrary or irrational." *Safley*, 482 U.S. at 89–90.

The remaining *Safley* factors are largely encompassed by the first, *see Amatel*, 156 F.3d at 196, and can be handily disposed of here. The second factor asks whether the prisoner has an alternative means of exercising the right at stake. In answering this question the court does not view the right "in terms of the materials excluded by the ban," as for example, here, the right to possess and use electric or electronic instruments. *Amatel*, 156 F.3d at 200. Rather, "the relevant right 'must be viewed sensibly and expansively.'" *Id.* at 201 (quoting *Thornburgh v. Abbott,* 490 U.S. 401, 417 (1989)). In *Thornburgh,* where the challenged prison regulation banned all "sexually explicit material which by its nature or content poses a threat to the security, good order, or discipline of the institution, or facilitates criminal activity," *Thornburgh*, 490 U.S. at 405 n.5, the Supreme Court found the second factor "clearly satisfied" because "the regulations at issue [there] permit[ted] a broad range of publications to be sent, received, and read," *id.* at 418. The right asserted here must similarly be broadly limned to include, at a minimum, all forms of musical expression (rather than simply the appellants' preferred medium of the electric guitar) and under the BOP regulations prisoners remain free to exercise such a right through alternative outlets such as voice and acoustic instruments. The third factor—whether accommodating the right has an "adverse impact 'on guards and other inmates, and on the allocation of prison resources,'" *Amatel*, 156 F.3d at 200 (quoting *Safley*, 482 U.S. at 90)—"seems in part a restatement of the deferential balancing called for under the first factor," *id*, and here can be readily answered.

If, as we have concluded, the possession and use of electric/electronic instruments costs prisons money, then it necessarily has an "adverse impact . . . on the allocation of prison resources." *See id.* (concluding that "if Congress may reasonably conclude that pornography increases the risk of prison rape, then the adverse impact [of accommodating the alleged right to pornography] is substantial" because it "poses a threat to the safety of guards and other inmates"). The fourth *Safley* factor—"whether there are alternatives that can accommodate that right 'at *de minimis* costs to valid penological interests,'" *Amatel*, 156 F.3d at 200 (quoting *Safley*, 482 U.S. at 91)—raises the only question here. While we know that the regulations save the BOP money, we do not know how much because we do not know the number of inmates who would otherwise use the banned instruments or the exact electrical and other costs that might be incurred. Nevertheless, given that the other factors all plainly favor upholding the regulation and this last remains an unknown, we believe the balance tips in favor of the appellees.

For the foregoing reasons, we conclude that the challenged BOP regulations prohibiting prisoner possession or use of electric and electronic musical instruments do not violate the APA or the Constitution. Accordingly, the judgment of the district court is

*Affirmed.*

KAREN LECRAFT HENDERSON, *Circuit Judge*, concurring:

I concur in the majority opinion but write separately because I believe the district court's decision can be affirmed on the ground the district court articulated. Following Representative Zimmer's lead, the BOP initially identified the penological interest underlying the ban as "to make prison more of a place of deterrence and punishment." Def's. Opp'n to Pls.' Statement of Material Facts at 2. Punishment and deterrence are not only legitimate penological interests, they are among the fundamental goals of our penological system. *See Rhodes v. Chapman*, 452 U.S. 337, 352 (1981) (identifying "goals of the penal function in the criminal justice system" as "to punish justly, to deter future crime, and to return imprisoned persons to society with an improved change of being useful, law-abiding citizens"); *Pell v. Procunier*, 417 U.S. 817, 822 (1974) ("An important function of the corrections system is the deterrence of crime. The premise is that by confining criminal offenders in a facility where they are isolated from the rest of society, a condition that most people presumably find undesirable, they and others will be deterred from committing additional criminal offenses.").* Further, the ban is reasonably related to the asserted goal—deterrence through punishment. It may be true, as the district court acknowledged, that "banning musical instruments, by itself, may not actually deter anyone." *Kimberlin v. Dep't of Justice*, 150 F. Supp. 2d 36, 45 (D.D.C. 2001). Nevertheless, as a matter of common sense, it is not irrational to believe that banning a broad spectrum of "perks," including electric and electronic musical instruments as both the Zimmer Amendment and the BOP regulations do, may, in the aggregate, produce such an effect. *See Safley*, 482 U.S. at 89–90 (noting that "a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational"); *Amatel*, 156 F.3d at 198 (noting that "scientific studies can

---

* The appellants "do not argue here that the governmental objective of punishment is not neutral, in the sense that it is ' "unrelated to the suppression of expression." ' " Appellants' Br. at 22 n.4 (quoting *Amatel* 156 F.3d at 197 (quoting *Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989))).

have a corrective effect by establishing an apparently implausible connection or refuting an apparently obvious one, but, subject to such corrections, conformity to commonsensical intuitive judgments is a standard element of both reasonableness and rationality").

The other three *Safley* factors give little pause. Under the BOP regulations prisoners are free to exercise their first amendment rights through forms of musical expression other than the electric guitar. Addressing the third factor, I believe that if the Congress and the BOP reasonably concluded that affording prisoners perks will reduce the deterrent effect of prisons, as a consequence the prison census will presumably increase so that "the adverse impact is substantial." *Cf.* maj. op. at 10 ("If, as we have concluded, the possession and use of electric/electronic instruments costs prisons money, then it necessarily has an 'adverse impact . . . on the allocation of prison resources.' ") (quoting *Amatel*, 156 F.3d at 200). As for the fourth factor, the appellants have not suggested an alternative that will accommodate their rights but will not at the same time diminish the deterrent effect of the BOP regulations.

1

TATEL, *Circuit Judge*, concurring in part and dissenting in part: I agree that the BOP regulation prohibiting electric and electronic instruments is a reasonable interpretation of the Zimmer Amendment and therefore does not violate the Administrative Procedure Act. I also have no doubt that the government can constitutionally restrict the use and possession of electric guitars in federal prisons. If the government had defended the electronic-music ban as reasonably necessary to promote internal order, for example, or even to promote a more efficient allocation of prison resources, then the Zimmer Amendment would easily qualify as a constitutional exercise of Congress's authority to manage the federal prisons. Or if the government had denied funds only for the *purchase* of electric and electronic instruments, that too would easily pass constitutional muster, since the government has no obligation to subsidize the exercise of First Amendment rights. The government, however, has done neither of these things. This court nevertheless sustains the amendment's constitutionality on the basis of a broad—indeed limitless—legal principle under which prison officials may ban not only the use and possession of electric guitars, but also the exercise of virtually any other constitutional right that requires electricity, guard supervision, or other prison resources—including the sending and receiving of inmate mail, and even the use and possession of books and magazines. Because the court's holding conflicts with binding Supreme Court and circuit precedent, and because its alternative basis for affirmance was neither argued nor even mentioned by the BOP, I dissent.

I.

In *Turner v. Safley*, 482 U.S. 78 (1987), which governs prisoners' constitutional challenges, the Supreme Court struck a balance between two competing principles. *Safley* first recognizes that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Id.* at 84. In the case before us, the BOP concedes—and this court agrees—that the Zimmer Amendment's electric-and electronic-music ban does restrict prisoners' First Amendment rights. Appellee's Br. at 8; *cf. Ward v. Rock Against Racism*, 491 U.S. 781 (1989) (employing First

Amendment scrutiny to analyze New York City's sound-amplification controls for a music concert). At the same time, however, *Safley* recognizes the competing principle that " 'prison administrators . . ., and not the courts, [must] make the difficult judgments concerning institutional operations,' " and that "[s]ubjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." *Safley*, 482 U.S. at 89 (quoting *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 128 (1977)). *Safley* therefore establishes a "unitary, deferential standard for reviewing prisoners' constitutional claims: '[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.' " *Shaw v. Murphy*, 532 U.S. 223, 229 (2001) (quoting *Safley*, 482 U.S. at 89). To evaluate a prison regulation's reasonableness, *Safley* directs courts to consider four factors:

> [F]irst, whether the restriction bears a "valid, rational connection" to the "legitimate governmental interest put forward to justify it," such that the "asserted goal is [not] so remote as to render the policy arbitrary or irrational"; second, whether inmates retain alternative means of exercising the circumscribed right; third, the costs that accommodating the right imposes on other inmates, guards, and prison resources generally; and fourth, whether there are alternatives to the regulation that "fully accommodate[ ] the prisoners' rights at *de minimis* cost to valid penological interests."

*Amatel v. Reno*, 156 F.3d 192, 196 (D.C. Cir. 1998) (quoting *Safley*, 482 U.S. at 89–91) (citations omitted) (alterations in original).

In sustaining the Zimmer Amendment's constitutionality, this court adopts a theory that effectively eviscerates *Safley*'s premise that prisoners generally retain their constitutional rights, as well as the decision's carefully constructed four-part test for evaluating the constitutionality of prison regulations

that restrict those rights. According to the court, because "the BOP has simply chosen not to subsidize inmates' use or possession of a class of instruments requiring the expenditure of funds for electricity and care," the BOP's regulation "does not implicate the appellants' First Amendment rights," and the court "therefore need not invoke the four factor analysis the United States Supreme Court established in *Turner v. Safley*." Maj. Op. at 7–8. I would have no problem with this conclusion if the Zimmer Amendment were limited to denying funds for *purchasing* electric guitars. But the amendment also prohibits prisoners from *using and possessing* their own guitars, and there is an important difference between a regulation that denies funds to buy guitars and one that denies funds for electricity or other infrastructural resources necessary for the exercise of constitutional rights. All prison activities depend on an infrastructure of basic resources, such as electricity, guard supervision, and space, which the government both necessarily pays for and controls. If the government can "cho[ose] not to subsidize inmates' use or possession of a class of instruments requiring the expenditure of funds for electricity and care," Maj. Op. at 8, then the government could just as easily choose not to "subsidize" inmates' use or possession of books, by withdrawing funds for electricity for light to read by, or it could decide not to "subsidize" inmate correspondence, by withdrawing funds for the distribution of prison mail.

To be sure, the costs associated with these various activities may differ, but as the court concedes, we have no evidentiary record to tell us how the costs of allowing prisoners to use and possess electric guitars compare with the costs of providing sufficient reading light or delivering prison mail. Maj. Op. at 10. In any event, the court's rationale for sustaining the Zimmer Amendment makes no distinction between activities that require large expenditures and those that do not. Indeed, by upholding the BOP's ban on electric and electronic instruments as a reasonable interpretation of the Zimmer Amendment, which merely denies *funding* for the use or possession of such instruments, the court itself recognizes the proposition that an appropriations law denying funding for certain activities generally amounts to a substantive ban on

those activities, regardless of the amount of funding involved. Maj. Op. at 6; *see Robertson v. Seattle Audubon Soc'y*, 429 U.S. 429, 440 (1992) ("Congress . . . may amend substantive law in an appropriations statute, as long as it does so clearly."); *Envtl. Def. Ctr. v. Babbitt*, 73 F.3d 867, 871–72 (9th Cir. 1995) (noting that the "use of *any* government resources— whether salaries, employees, paper, or buildings—. . . entail[s] government expenditure," and that "[t]he government cannot make expenditures, and therefore cannot act, other than by appropriation") (emphasis added).

In the end, almost any restriction of prisoners' constitutional rights can be recast as a ban on funding for those rights. But as this court observed in *Amatel*, in prisons, "[w]here the government absolutely monopolizes the means of speech or controls a bottleneck, . . . a refusal to fund functions the same as an outright ban." 156 F.3d at 194 n.1. That the government "monopolizes" certain "means of speech" in prisons is what sets this case apart from *Regan v. Taxation With Representation*, 461 U.S. 540 (1983). *See* Maj. Op. at 9. In *Regan*, the Supreme Court upheld a restriction on lobbying activities for tax-exempt charities on the ground that "a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny." *Id.* at 549. Describing the governing principle as "simple," the Court explained that " 'although government may not place obstacles in the path of a [person's] exercise of . . . freedom of [speech], it need not remove those not of its own creation.' " *Id.* at 549–50 (quoting *Harris v. McRae*, 448 U.S. 297, 316 (1980)). In other words, when the government denies tax-exempt status to organizations that engage in lobbying, those organizations remain free to continue their lobbying activities—the First Amendment expression in question. *See Taxation With Representation*, 461 U.S. at 545. Similarly, when the government denies tax deductions for lobbying activities, taxpayers remain free to engage in political advocacy, *see Cammarano v. United States*, 358 U.S. 498 (1959), and when the government denies public funding to candidates for public office, those

candidates remain free to seek election, *see Buckley v. Valeo*, 424 U.S. 1, 90–107 (1976) (per curiam).

Even in the prison context, if the government denies federal funds for purchasing magazines, books, stationery, or even electric guitars, it has "place[d] no governmental obstacle in the path" of prisoners seeking to read, write, or play, since they remain free to purchase those items on their own. *Harris v. McRae*, 448 U.S. 297, 315 (1980). This is not so when the government denies funds for prisoners' use of prison-controlled infrastructural resources to exercise constitutional rights. Because prisons absolutely control the electricity supply and storage space, as well as other infrastructural resources, such as mail distribution systems, denying federal funds for those resources is quite different from a refusal to "subsidize" First Amendment rights. Prisoners can neither generate their own electricity, nor construct their own storage space, nor deliver their own mail. Denying access to these resources therefore places an intractable "governmental obstacle in the path" of prisoners seeking to exercise their rights.

If this court's subsidy rationale were correct, the reasoning of *Amatel*, *Safley*, and other like cases would have been quite different. *Amatel* dealt with an appropriations rider that barred the use of federal funds to distribute sexually explicit materials in prisons. Observing that the prison distribution system was a "bottleneck" under the government's control, and that there was no suggestion that prisoners might be able to "obtain[ ] such material at their own expense" outside of that distribution system, we treated the government's refusal to spend money on the distribution of such material as an "outright ban" on sexually explicit materials in prison. *Amatel*, 156 F.3d at 194 n.1. But if Congress's decision to eliminate expenditures necessary for the exercise of First Amendment rights implicates no First Amendment concerns, as this court now holds, then we need not have spent pages running through the *Safley* factors to determine whether the ban on sexually explicit materials was reasonably related to the government's interest in rehabilitating prisoners; we could have ended the opinion after the statement of facts. The same is true for *Safley*, part of which sustained restric-

tions on inmate-to-inmate correspondence, and *Thornburgh v. Abbott*, 490 U.S. 401 (1989), which sustained restrictions on certain book and magazine subscriptions. Had the Government defended those restrictions on the theory that they merely eliminated "subsidies" for First Amendment rights, the Court's careful application of the *Safley* factors would have been entirely unnecessary. Indeed, under this court's holding, Missouri could now reenact the prohibition on inmate marriage that the Supreme Court struck down in the remainder of *Safley* simply by recasting it as a ban on *funding* for inmate marriage, since inmate weddings no doubt require expenditures for guard supervision and for electricity to light the wedding venue.

Of course, the government need not provide any and all resources necessary for prisoners to engage in constitutionally protected activities, but *Safley* teaches that if the government wants to cut back on infrastructural resources necessary for the enjoyment of constitutional rights, it must explain how the cutback is "reasonably related" to its "legitimate penological interest" in ensuring a more efficient allocation of BOP resources and show how the cutback satisfies the four-part *Safley* test. In other words, Congress may not bypass *Safley* through the simple expedient of using an appropriations law that functions, in effect, as an outright ban.

## II.

Perhaps recognizing the weakness in its attempted end-run around *Safley* and justifiably dubious that this court might actually accept it, the BOP devotes most of its brief to defending the Zimmer Amendment on the ground that it does in fact satisfy *Safley*, arguing—apparently for the first time in litigation of this kind, *see Kimberlin v. Dep't of Justice*, 150 F. Supp. 2d 36, 44 (D.D.C. 2001)—that the government's interest in enhancing the punitive and deterrent value of prison can justify a regulation that limits prisoners' constitutional rights. Although both the district court and the con-

curring opinion embrace it, this argument is as flawed as it is novel.

Because punishment and deterrence are unquestionably among the fundamental "goals of the penal function in the criminal justice system," *Rhodes v. Chapman*, 452 U.S. 337, 352 (1981), I have no doubt that the government may enhance prison's punitive and deterrent value by eliminating weight-lifting equipment, in-cell coffee pots, and other "perks" not protected by the First Amendment. *See* Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104–208, § 611, 110 Stat. 3009, 3009–66 (1996). The BOP's defense of the Zimmer Amendment, however, presents a very different question: Does the goal of enhancing the punitive and deterrent value of prison by making prison conditions more onerous justify limiting prisoners' constitutional rights? As long as *Safley* is the law—that is, as long as prisoners generally retain their constitutional rights—the answer must be no, for there is no discernable limit to the government's ability to invoke punishment or deterrence as reasons for adopting regulations that restrict constitutional rights. The BOP's rationale for banning electric guitars could also justify banning all musical instruments, or all music, or even all books, including the Bible and the Koran, on the ground that denying these "perks" will make prison more onerous and "more of a place of deterrence and punishment." Concurring Op. at 1 (internal quotation marks and citation omitted). Under this theory, the government could, subject only to whatever limitations the Eighth Amendment imposes, reduce prisons to places of virtually silent, solitary confinement, where prisoners may not read, write, or engage in any other expressive activity.

The BOP's theory conflicts with *Safley* in two additional respects. First, *Safley* does not contemplate punishment as one of the interests that justifies restrictions on prisoners' constitutional rights. Its deferential standard of review is designed only to respond to the fact that "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and

executive branches of government." 482 U.S. at 84–85; *see also Amatel*, 156 F.3d at 196 ("[B]y their nature, [governmental institutions such as prisons] must allow regulation more intrusive than what may lawfully apply to the general public. In these environments, the government is permitted to balance constitutional rights against institutional efficiency in ways it may not ordinarily do.") (citations omitted). The type of "legitimate penological interests" to which *Safley* refers are administrative matters such as "the preservation of internal order or discipline, the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners," all of which are particularly within prison officials' expertise. *Procunier v. Martinez*, 416 U.S. 396, 412 (1974). The BOP's novel punishment rationale has nothing whatsoever to do with these operational, security, and management concerns. And while it is possible that a prison regulation might not be rationally related to such concerns, *see, e.g.*, *Safley*, 482 U.S. at 97–98 (holding a ban on inmate marriage to be insufficiently related to the state's asserted goals of promoting security and prisoner rehabilitation), regulations that deprive prisoners of their constitutional rights will *always* be rationally related to the goal of making prison more miserable. Banishing electric guitars from prison will certainly make prison less pleasant, but banishing all musical instruments—or even all music—would make it even less pleasant still, as would banning books, magazines, and letters from family and friends. While it is true that this case involves a relatively minor incursion on prisoners' constitutional rights, the rationale the BOP offers, and that the district court accepted, would justify all of these far more significant constitutional deprivations.

Second, the remaining factors that *Safley* instructs us to consider in evaluating the "reasonableness" of a prison regulation that impinges on constitutional rights make little sense when the government's only reasons for the regulation are punishment and deterrence. All of those factors—"whether inmates retain alternative means of exercising the circumscribed right," "the costs that accommodating the right imposes on other inmates, guards, and prison resources general-

ly," and "whether there are alternatives to the regulation that 'fully accommodate[ ] the prisoners' rights at *de minimis* cost to valid penological interests,'" *Amatel*, 156 F.3d at 196 (quoting *Safley*, 482 U.S. at 90–91)—are designed to ensure that legitimate management and security considerations do not unnecessarily limit prisoners' constitutional rights. But if the government's very purpose is to make prison more onerous, then why ask whether there are alternative means of expression available or less costly ways to accommodate the constitutional rights at issue? After all, the greater the deprivation, the stronger the connection between the restriction and the government's goal of punishment and deterrence.

## III.

This brings me finally to the court's alternative holding. Unable to accept the BOP's assertion of punishment and deterrence as legitimate penological interests for purposes of the *Safley* test, and perhaps aware of the flaws in its primary holding that *Safley* does not apply at all, the court offers its own *Safley*-based reason for sustaining the Zimmer Amendment: that the regulation is "reasonably related" to the "legitimate penological interest" of conserving correctional funds. Maj. Op. at 8–10. Had the BOP made this argument, it might well have provided a valid basis for upholding the Zimmer Amendment. But the BOP identifies only deterrence and punishment as its "legitimate penological interests," and explains only how the Zimmer Amendment relates to these two interests, never once even hinting—either in its brief or at oral argument—that the Zimmer Amendment might also reasonably relate to a governmental interest in conserving correctional funds. The only place the concept of money appears in the BOP's discussion of the Zimmer Amendment's goals is in a quotation from the district court— "The District Court found from this legislative history that Congress enacted the Zimmer Amendment to 'curb spending on prison amenities and to enhance the prison as a deterrent'"—to which the BOP attaches the following conclusion: "Therefore, Congress' punitive intent is clear from the legislative history." Appellee's Br. at 12–13. The BOP's focus on

punishment and deterrence is hardly surprising, since, aside from a cursory reference to eliminating this "waste of taxpayer dollars," the Zimmer Amendment's legislative history makes quite clear that punishment and deterrence were in fact the amendment's primary objectives. 147 Cong. Rec. H7751, H7768 (July 1995) (statement of Rep. Zimmer), (emphasizing that "inmate amenities are better than what law-abiding Americans have" and that such "prison perks undermine the concept of jails as deterrence").

Although we are, of course, free to "consider any argument on appeal that supports the judgment of the District Court," *Dimond v. District of Columbia*, 792 F.2d 179, 187 (D.C. Cir. 1986), we may not decide a case on a claim that the parties have neither briefed nor argued nor even mentioned. Doing so is not only unfair to the parties, who have had no opportunity to respond to the court's rationale or to object to the court's willingness to decide the case without an appropriate evidentiary record, *Corson & Gruman Co. v. NLRB*, 899 F.2d 47, 50 n.4 (D.C. Cir. 1990) ("We require petitioners and appellants to raise all of their arguments in the opening brief to prevent 'sandbagging' of appellees and respondents and to provide opposing counsel the chance to respond."), but it undermines "[t]he premise of our adversarial system[,] . . . that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983).

## IV.

Whether Congress may ban electric guitars from federal prisons might seem an unimportant—even trivial—question, but courts are obligated to adjudicate even seemingly unimportant issues in accordance with the Constitution and prevailing case law. So long as *Safley* remains the law of the land, courts are obligated to ensure that any restriction on prisoners' constitutional rights—whether in the form of an outright ban or a denial of funding that functions as an outright ban—is reasonably related to the government's legit-

imate penological interests. I would thus reject the BOP's subsidy rationale and remand to the district court, where the BOP may, if it chooses, attempt to defend the Zimmer Amendment as a reasonable response to its financial concerns.