# Application of Record Destruction Requirements to Information Received From the National Instant Criminal Background Check System

Under the laws governing destruction of background check information, the Bureau of Alcohol, Tobacco, Firearms, and Explosives—which routinely receives and retains certain information from the National Instant Criminal Background Check System whenever the NICS determines that an individual seeking to purchase a firearm may not lawfully receive a firearm—does not have to destroy that information if the NICS later overturns that determination.

January 11, 2005

MEMORANDUM OPINION FOR THE CHIEF COUNSEL
BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES

The Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") routinely receives and retains certain information from the National Instant Criminal Background Check System ("NICS") whenever the NICS determines that an individual seeking to purchase a firearm may not lawfully receive a firearm. You have asked whether, under the laws governing destruction of background check information, ATF must destroy that information if the NICS later overturns that determination.[1] We conclude that these laws do not require ATF to do so in such circumstances.

## I.

The Brady Handgun Violence Prevention Act ("Brady Act") required the Attorney General to "establish a national instant criminal background check system that any licensee may contact . . . for information, to be supplied immediately, on whether receipt of a firearm by a prospective transferee would violate [certain federal laws] or State law." Pub. L. No. 103-159, § 103(b), 107 Stat. 1536, 1541 (1993). The Attorney General has carried out this mandate by establishing and maintaining the NICS within the Federal Bureau of Investigation ("FBI"). *See* 28 C.F.R. §§ 25.1 & 25.3 (2004).

Another section of the Brady Act (§ 102(b) (codified at 18 U.S.C. § 922(t)(1) (2000))), requires federally licensed firearms dealers ("FFLs" or "licensees") in most cases to contact the NICS before selling a firearm to a person. Upon receiving an inquiry, the NICS checks certain databases and in the ordinary course immediately issues one of two determinations: (1) a "proceed," which indicates that the NICS has no information that the firearm transfer would be unlawful, and that the transfer is

---

[1] *See* Memorandum for the Office of Legal Counsel, Department of Justice, from Stephen R. Rubenstein, Acting Chief Counsel, Bureau of Alcohol, Tobacco, and Firearms, Department of the Treasury, *Re: Request for an Opinion* (undated) ("ATF Opinion Request").

allowed, or (2) a "denied," which indicates that the person is prohibited from receiving a firearm, and that the transfer is not allowed. *See id.*; 28 C.F.R. §§ 25.2 & 25.6(c)(1) (2004) (defining these terms and describing responses that the NICS may provide); *National Instant Criminal Background Check System Regulation*, 69 Fed. Reg. 43,892, 43,897 (July 23, 2004) ("Currently, approximately 74 percent of all transactions are completed immediately and approximately 92 percent are completed while the FFL is still on the telephone with the FBI NICS Section."). In some cases, however, the NICS issues a "delayed" response, indicating that it has been unable to determine immediately whether or not the transaction may proceed, and that the inquiry remains "open." 28 C.F.R. §§ 25.2 & 25.6(c)(1); *see* 69 Fed. Reg. at 43,900–01 (to be codified at 28 C.F.R. § 25.9(b)(1)(ii)). But if the NICS has not issued a denial within three business days, the restriction on transfer by the licensee expires. *See* 18 U.S.C. § 922(t)(1)(B)(ii). The NICS may, however, continue to investigate the person and subsequently determine that the transfer should not have been permitted, in which case it issues a "delayed denial."

The FBI keeps records of all NICS background checks in an automated "audit log," a chronological record of NICS activities that includes, among other information concerning an inquiry, the name of the potential gun purchaser. 28 C.F.R. § 25.9(b)(1) (2004); *see* 69 Fed. Reg. at 43,900–01 (to be codified at 28 C.F.R. § 25.9(b)(1)); *see generally NRA v. Reno*, 216 F.3d 122 (D.C. Cir. 2000) (discussing audit log and upholding it against various challenges). When a denial issues, the FBI, pursuant to regulations it has issued under the Privacy Act, 5 U.S.C. § 552a (2000), routinely forwards the audit log information for that inquiry to ATF's Brady Operations Branch. "Routine Use C" of the FBI's Privacy Act regulations for the NICS provides:

> If, during the course of any activity or operation of the system authorized by the regulations governing the system (28 CFR, part 25, subpart A), any record is found by the system which indicates, either on its face or in conjunction with other information, a violation or potential violation of law (whether criminal or civil) and/or regulation, the pertinent record may be disclosed to the appropriate agency/organization/task force . . . charged with the responsibility of investigating, prosecuting, and/or enforcing such law or regulation, *e.g.*, disclosure of information from the system to the ATF . . . regarding violations or potential violations of 18 U.S.C. § 922(a)(6). (This routine use does not apply to the NICS Index.)

*Privacy Act of 1974; Notice of Modified System of Records*, 63 Fed. Reg. 65,223, 65,226–27 (Nov. 25, 1998). Routine Use C was established pursuant to advice provided by this Office, *see Brady Act Implementation Issues*, 20 Op. O.L.C. 57, 59–61 (1996), and, as of July 2004, substantially the same language appears in the regulations implementing the NICS, 69 Fed. Reg. at 43,901 (to be codified at 28

C.F.R. § 25.9(b)(2)(i)); *see also id.* at 43,895 ("This change is consistent with Routine Use C in the NICS Privacy Act Notice"). When the NICS issues a standard denial (that is, within the three-day period that a firearms licensee must wait), ATF's Brady Operations Branch forwards the audit log information to an ATF field office for investigation only if it meets certain criteria. However, when the NICS issues a delayed denial, the Operations Branch automatically forwards the information, because of the significant possibility that a person prohibited from receiving a firearm has already done so. In either case, once the audit log information arrives at the field office, an ATF agent opens a case file (of which the information becomes one part) and commences an investigation. Should ATF concur in the NICS's conclusion, it may be necessary for ATF to retrieve firearms from the purchaser.

In some instances, the NICS overturns a denial after the FBI has transferred to ATF the audit log information regarding that denial. The NICS might overturn a denial at any time and for a number of reasons. A change in state law can create a large number of overturned denials by eliminating a disability that had been based on state law; in addition, some firearms disabilities, such as certain restraining orders, are by their nature temporary, *see* 28 C.F.R. § 25.9(a). Sometimes new information indicates that the NICS's initial denial was incorrect. Or the NICS may simply discover that it made an error.[2] The Brady Act provides an appeal and correction procedure by which a denied person may challenge a denial that he believes was in error. *Id.* § 103(g), 107 Stat. at 1542; 28 C.F.R. § 25.10 (2004).

Several laws limit the information that may be retained regarding background checks in general and overturned denials in particular. First, section 922(t)(2) of title 18 requires that

> [i]f receipt of a firearm would not violate subsection (g) or (n) or State law, the system shall—
>
> > (A) assign a unique identification number to the transfer;
> >
> > (B) provide the licensee with the number; and
> >
> > (C) *destroy all records of the system with respect to the call* (other than the identifying number and the date the number was assigned) *and all records of the system relating to the person or the transfer*.

(Emphasis added.)

Second, an appropriations rider contained in section 615 of the Consolidated Appropriations Act, 2005, prohibits the use of federal funds for

---

[2] *See* ATF Opinion Request at 1, 8.

> any system to implement subsection 922(t) of title 18, United States Code, that does not require and result in the destruction of any identifying information submitted by or on behalf of any person who has been determined not to be prohibited from possessing or receiving a firearm no more than 24 hours after the system advises a Federal firearms licensee that possession or receipt of a firearm by the prospective transferee would not violate [18 U.S.C. § 922(g) or § 922(n)], or State law.

Pub. L. No. 108-447, § 615(2), 118 Stat. 2809, 2915 (2004). This rider was first enacted for fiscal year 2004. *See* Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 617(a)(2), 118 Stat. 3, 95. In regulations implementing section 922(t)(2) and the 2004 rider, the Attorney General has provided that, if the NICS has issued a "proceed," the FBI must within 24 hours destroy "all identifying information submitted by or on behalf of the transferee" and must within 90 days destroy "[a]ll other information," except the identification number assigned to the transfer and the date that the number was assigned. 69 Fed. Reg. at 43,901 (to be codified at 28 C.F.R. § 25.9(b)(1)(iii)). If the NICS has issued a denial, the FBI does not destroy the information. If a NICS inquiry remains open, the NICS may retain the information for up to 90 days. *See id.*

Third, section 103(i) of the Brady Act (which has not been codified) limits the ability of the government to retain information in connection with the background check system that section 103(b) requires the Attorney General to establish, by providing:

> No department, agency, officer, or employee of the United States may—
>
> (1) require that any record or portion thereof generated by the system established under this section be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or political subdivision thereof; or
>
> (2) use the system established under this section to establish any system for the registration of firearms, firearm owners, or firearm transactions or dispositions, except with respect to persons, prohibited by section 922(g) or (n) of title 18, United States Code or State law, from receiving a firearm.

Brady Act § 103(i), 107 Stat. at 1542, *reprinted in* 18 U.S.C. § 922 note.

In the case of an overturned denial, the NICS would be required to destroy the relevant audit log information (except for the identifying number and the date it was assigned). You have asked whether ATF must do likewise with its copy of

that audit log information, previously received from the NICS. You have explained that ATF wishes to maintain its copy in the relevant investigative case file so that it may have "complete records of [its] enforcement actions in case those actions are later challenged." ATF Opinion Request at 9. For example, when ATF files criminal charges against a denied person or seizes a firearm from a denied person, and then the denial is overturned, that person may challenge ATF's actions. You are concerned that, in such cases, "[w]ithout the records reflecting the initial NICS denial and the actions that flowed from the initial denial, it will be difficult for ATF to vigorously defend its actions." *Id.*

## II.

The laws discussed above do not require ATF to destroy the NICS audit log information in its case files concerning a denial that NICS has overturned. Section 922(t)(2)'s requirement that "the system" destroy "all records of the system" does not require ATF to destroy its copy of this information, because ATF is not and does not operate "the system" to which this section refers; nor are ATF's case files "records of the system." 18 U.S.C. § 922(t)(2). For similar reasons, the appropriations rider does not prevent ATF from keeping its files relating to overturned denials, because such files are not part of "any system to implement subsection 922(t)." 118 Stat. at 2915. Finally, under section 103(i) of the Brady Act, ATF's retention of overturned denial files neither involves a "require[ment]" that any third party transfer records to a government facility nor creates a "system for . . . registration." 107 Stat. at 1542.

## A.

The text of section 922(t)(2) does not impose an obligation upon ATF with regard to the case files that you have described. That text obligates only "the system" to destroy records, and requires the system to destroy only "records of the system": When "receipt of a firearm would not violate [certain federal laws] or State law," the text states, "*the system*" must "assign a unique identification number," "provide the licensee with the number," and "*destroy all records of the system* with respect to the call . . . and . . . the person or the transfer." 18 U.S.C. § 922(t)(2) (emphases added).

In the context of section 922(t) and the closely related section 103 of the Brady Act, "the system" is a term of art referring to the NICS—"the national instant criminal background check system." *Id.* § 922(t)(1). Section 922(t)(1) refers to the Attorney General's notification of licensed federal firearms dealers, "under section 103(d) of the Brady . . . Act," "that *the* national instant criminal background check *system* is established." *Id.* (emphases added). It then prohibits such dealers from transferring a firearm to someone who is not a licensee "unless . . . before the completion of the transfer, the licensee contacts *the* national instant criminal

background check *system*." *Id.* § 922(t)(1)(A) (emphases added). It thereafter refers simply to "the system" three times. In context, the meaning must be that particular system named immediately beforehand; the shorthand makes no sense otherwise. That same shorthand phrase—"the system"—appears in the immediately following section 922(t)(2) at issue here, and it appears in the same context as in section 922(t)(1), referring to the system regarding transfers by firearms licensees. It must therefore be taken to have the same meaning. Later paragraphs of section 922(t) likewise use "the system" and the fuller phrase ("the national instant criminal background check system") interchangeably. *See id.* § 922(t)(4)–(6). And no provision in section 922(t) uses "the system" with any apparent meaning other than to refer to the NICS. Likewise, various provisions of uncodified section 103, to which section 922(t) expressly refers, speak simply of "the system" when discussing requirements for the NICS, *see* Brady Act § 103(d), (e), (f) & (i), 107 Stat. at 1541–42, and the Attorney General's regulations implementing section 103 define "System" as "the National Instant Criminal Background Check System," 28 C.F.R. § 25.2. *See Comm'r v. Lundy*, 516 U.S. 235, 250 (1996) ("identical words used in different parts of the same act are intended to have the same meaning") (internal quotation omitted).

The statutory language and the regulations governing the NICS indicate that an entity is included within the NICS if and to the extent that it performs functions that Congress has assigned to "the system." The "system" that Congress required to be established under the Brady Act is one "that any licensee may contact, by telephone or by other electronic means in addition to the telephone, for information, to be supplied immediately, on whether receipt of a firearm by a prospective transferee would" be unlawful. Brady Act § 103(b), 107 Stat. at 1541. It is "contact[ed]" by a licensee, "assign[s]" an identification number to the requested transfer, "provide[s]" that number to the licensee, and "notifie[s]" the licensee of a denial. 18 U.S.C. § 922(t)(1) & (2). Thus, the system includes the FBI's "NICS Operations Center," which "receives telephone or electronic inquiries from FFLs to perform background checks [and] makes . . . determination[s] . . . whether the receipt or transfer of a firearm would be in violation of Federal or state law." 28 C.F.R. § 25.2. The system also includes state and local law enforcement Points of Contact—known as POCs—which act as "intermediar[ies] between an FFL and the federal databases," "receive NICS background check requests from FFLs, . . . perform NICS inquiries, determine whether matching records provide information demonstrating that an individual is disqualified [for] possessing a firearm under Federal or state law, and respond to FFLs with the results of a NICS background check." *Id.*; *see also id.* § 25.9(d) (describing which "records of state and local law enforcement units serving as POCs will be subject to the Brady Act's requirements for destruction"); *NRA*, 216 F.3d at 138 (assuming that POCs are part of "the system" and subject to the Brady Act's document destruction requirement except when the information is also subject to state law retention requirements).

ATF is not an element of the NICS and does not perform these functions on behalf of the NICS. ATF is not contacted by FFLs regarding prospective transfers; does not assign or provide the identification numbers; does not conduct the search of records to determine whether prospective transfers would be lawful; does not make those determinations; and does not notify FFLs of such determinations. Thus, section 922(t)(2), in providing that "the system shall" do certain things, including destroying certain records regarding approved transfers, imposes no obligation on ATF with regard to its case files.

Furthermore, the materials in ATF's case files are not "records of the system," even if those files contain information that originated with the NICS and thus began as such records. That is why, as noted above, the NICS forwards the audit log information to ATF pursuant to regulations allowing certain disclosure of NICS records *outside of that system* and expressly referring to "disclosure of information *from* the system *to* the ATF"—not to movement of records within the system. 63 Fed. Reg. at 65,227 (emphasis added); *see also* 69 Fed. Reg. at 43,901 (to be codified at 28 C.F.R. § 25.9(b)(2)(i)). ATF field agents who receive the audit log information from the NICS (via the Brady Operations Branch) concerning denied transactions open independent case files, of which that information constitutes a part, and the agents use it in conducting their independent investigation. The contents of those files, including information obtained from outside ATF, thus become records of ATF, not of any originating agency or system of records. *See Privacy Act of 1974; Systems of Records*, 68 Fed. Reg. 3551, 3553 (Jan. 24, 2003) (describing ATF's "Criminal Investigation Report System," which is a system of ATF records for purposes of the Privacy Act, and which includes agents' case files); ATF Opinion Request at 7 ("'Case Files (Investigative Files)' [are] 'records . . . maintained at the field division as a result of investigations of violations of Federal alcohol, tobacco, and firearms and explosives statutes and other investigations required by law.'") (quoting ATF Records Control Schedule, April 5, 2002). For this reason as well, section 922(t)(2) does not impose an obligation on ATF to destroy information in its case files concerning overturned denials.

## B.

The appropriations rider, section 615(2), calls for a similar analysis and conclusion. That provision prohibits the use of federal funds for "any system to implement subsection 922(t) . . . that does not require and result in the destruction of any identifying information submitted by or on behalf of any person" not prohibited from possessing or receiving a firearm, within 24 hours after that determination is communicated to an FFL. The rider thus prohibits the use of funds for a "system" and expressly defines the "system" in question as one implementing section 922(t). The ATF case files in question, however, even if they constitute a single

"system" in some sense, *see* 68 Fed. Reg. at 3553, are not designed "to implement subsection 922(t)," 118 Stat. at 2915. Thus, the rider does not restrict any use of funds by ATF with regard to those files or require ATF to destroy any information in those files upon the overturning of a denial by the NICS.

As shown above, the only existing "system to implement subsection 922(t)" is the NICS, the system to which section 922(t) itself expressly and exclusively refers. ATF is not a part of the NICS. And even if the rider, by referring to "any" system, might be read to contemplate creation of another implementing system for section 922(t), we see no basis for concluding that the ATF case files are such a system or that the contents of the ATF files constitute records or information of such a thing. As you have explained, the purpose of the case files is to facilitate ATF's independent investigations in furtherance of its law enforcement duties; they contain "documents relating to [an] investigation." ATF Opinion Request at 7 (quoting ATF Records Control Schedule). Thus, the use of money in furtherance of ATF's work is not use for a system to implement section 922(t).

Nor do we read the rider to require *the NICS* to ensure the destruction of information possessed by ATF as a condition to *the NICS's* use of appropriations. While the rider is not entirely clear whether it requires the destruction only of identifying information within the system or also requires NICS to reach out and ensure the destruction of identifying information that has properly been transferred outside of the system, the text seems to focus on the internal operations of the system and thus suggests the former. In our view, it simply creates a specific deadline for destroying certain records already subject to section 922(t)(2)'s destruction requirement; it does not impose a distinct and more far-reaching destruction requirement. This reading harmonizes well with section 922(t)(2), which already imposes a broad destruction requirement but lacks any deadline for such destruction.

The backdrop against which Congress first passed the rider bolsters this understanding. The duration of the NICS's retention of its audit log information concerning allowed transactions had been a subject of litigation and repeated regulatory revision, events of which Congress can be presumed to have been aware and which it likely intended to address. *See NRA*, 216 F.3d at 126 (noting revisions); *id*. at 127–28 (concluding that section 922(t)(2)(C) need not be read to require *immediate* destruction of information). Furthermore, at the time Congress first enacted the rider, the FBI had put Congress on notice that NICS information was being transferred, pursuant to Routine Use C, to entities such as ATF for law enforcement purposes. *See* 63 Fed. Reg. at 65,226–27. In view of this preexisting agency practice, had Congress wished to require the destruction of additional information—outside of "the system"—not already subject to section 922(t)(2)'s destruction requirement, one would expect the rider to have said so simply and directly.

Furthermore, the Attorney General, in his implementing regulations for the NICS, has likewise interpreted the rider as simply imposing a deadline for carrying out section 922(t)(2)'s destruction requirement. Within the section of the regulations concerning retention and destruction of records, he has provided that, for NICS audit log records regarding allowed transactions, "all identifying information submitted by or on behalf of the transferee will be destroyed within 24 hours." 69 Fed. Reg. at 43,901 (to be codified at 28 C.F.R. § 25.9(b)(1)(iii)). In issuing this provision, he explained that "[t]he [rider] simply reduces the record retention time for records subject to the Brady Act's record destruction requirement; it does not expand the records that are subject to the destruction requirement." *Id*. at 43,898; *see id.* at 43,893 (the rider "addresses the time within which *the NICS* is required to destroy certain information") (emphasis added). For the reasons we have given, even if the rider could reasonably be read otherwise, the Attorney General's interpretation is reasonable, and it merits deference pursuant to *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984). *See id.* at 842–43 (holding that a court must uphold an agency's interpretation of a statute that it administers unless "the intent of Congress is clear" as to the "precise question at issue" or the agency's interpretation is "unreasonable").[3]

## C.

Lastly, neither paragraph of section 103(i) of the Brady Act prohibits ATF from maintaining audit log information in a case file in the event of an overturned denial. The first paragraph, section 103(i)(1), prohibits the government from "requir[ing] that any record or portion thereof generated by the system established under this section be recorded at or transferred" to a government facility. Brady Act § 103(i)(1), 107 Stat. at 1542, *reprinted in* 18 U.S.C. § 922 note. In our view, this paragraph forbids the government from requiring *third parties*, such as firearms dealers, to record certain NICS information at, or transfer it to, a governmental facility. It does not prohibit the government itself from recording that information. Interpreting section 103(i)(1) to do so would make it impossible to square this paragraph with other provisions of the Brady Act that authorize, and in

---

[3] An agency's interpretation of a particular statutory provision "qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001). Congress has delegated authority to the Attorney General generally to make rules carrying the force of law in this area, *see* 18 U.S.C. § 926(a) (2000) (providing authority to promulgate rules regarding chapter of 18 U.S.C. that includes section 922), and also has required that he make rules with regard to the NICS, *see* Brady Act § 103(h), 107 Stat. at 1542 (requiring the Attorney General to "prescribe regulations to ensure the privacy and security of the information of the system established under this section"). In *NRA*, 216 F.3d at 126–27, the D.C. Circuit recognized the Attorney General's authority under *Chevron* to interpret section 922(t), to which the rider expressly relates, and *Chevron* applies to an agency's construction of its appropriations bill, *see Kimberlin v. Dep't of Justice*, 318 F.3d 228, 231–32 (D.C. Cir. 2003).

some cases require, the government to make records of NICS transactions. For example, section 103(g) requires the Attorney General to entertain challenges to, and to correct, certain "records of the system." 107 Stat. at 1542. Section 103(i)(2) permits the NICS to establish a firearms registry "with respect to persons prohibited . . . from receiving a firearm." *Id.* And 18 U.S.C. § 922(t)(2)(C) requires the NICS, for allowed transactions, to "destroy all records of the system . . . *other than* the identifying number and the date the number was assigned." (Emphasis added.) These provisions, which contemplate the government's requiring its employees to create records at a government facility, preclude reading section 103(i)(1) to impose a restriction on the government, as opposed to third parties. In addition, NICS checks could not even be processed without the system temporarily recording information about a proposed transaction. This is the interpretation to which the Attorney General has adhered in litigation and that the D.C. Circuit has found not unreasonable. *See NRA*, 216 F.3d at 131 (holding that paragraph (1) does not unambiguously prohibit the government from recording NICS information in an audit log, and crediting the Attorney General's interpretation). For the reasons given, we concur in that interpretation. Thus, section 103(i)(1) does not prohibit ATF from maintaining audit log information in its case files.

Section 103(i) next, in its second paragraph, provides that the government may not "use [the NICS] to establish any system for the registration of firearms, firearm owners, or firearm transactions or dispositions, except with respect to persons prohibited . . . from receiving a firearm." Brady Act § 103(i)(2), 107 Stat. at 1542. As you have explained ATF's actions, ATF is not implementing any "system for . . . registration." The purpose of ATF's retention of the audit log information in independent case files appears to be a bona fide effort to facilitate ATF's carrying out of its law enforcement duties, not any purpose of "registration of firearms, firearms owners, or firearm transactions or dispositions." Nor does a "system for . . . registration" appear at all likely to be a result of ATF's practice. You have explained that the number of records in question—those involving "the small number of cases where denials were overturned and independent case files were opened"—represents only "a minute fraction of the audit log." ATF Opinion Request at 11. Yet the audit log *as a whole* has been held by the D.C. Circuit (correctly in our view) not to be unambiguously prohibited by section 103(i)(2) because, among other things, it "represents only a tiny fraction of the universe of firearm owners" and, given that it only records *requests* for transfers, does not even indicate whether an "approved gun purchaser[] actually completed a transaction." *NRA*, 216 F.3d at 131. It is true that information in the case files concerning an overturned denial will be retained for a much longer period than information in the audit log concerning an approved transaction—at the time of the *NRA* decision, the latter was retained for six months; now, it is retained for no more than 90 days or, in some cases, 24 hours—but given the small number of ATF records at issue, we see no reason to reach a contrary conclusion.

## III.

Accordingly, and based on our understanding of the facts as presented, we conclude that nothing contained in the laws discussed above prohibits ATF from retaining in its case files NICS audit log information concerning an overturned denial. Please let us know if we may provide any further assistance.

C. KEVIN MARSHALL
*Acting Deputy Assistant Attorney General*
*Office of Legal Counsel*
